FILED
2019 Oct-22 PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )   Civil Action No. 5:19-CV-00991-CLS |
| | ) |
| NORTHROP GRUMMAN SYSTEMS CORPORATION, | ) ) ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM OPINION

An individual identified by the pseudonym "John Doe"[1] claims that his former employer, Northrop Grumman Systems Corporation ("Northrop Grumman"), violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. 42 U.S.C. § 12101 *et seq*. ("ADA"). The action now is before the court on Northrop Grumman's motion, filed pursuant to Federal Rule of Civil Procedure 12(b)(6), asking the court to strike the hostile work environment statements mixed into the text of plaintiff's claim for "Sexual Discrimination under Title VII" (Count I of the Amended Complaint),[2] and,

---

[1] The complaint that commenced this action and its attached exhibits identified plaintiff by his legal name. On August 12, 2019, however, United States Magistrate Judge Herman N. Johnson, Jr., to whom this case then was assigned, entered an Order sealing that complaint (doc. no. 1), its exhibits (doc. nos. 1-1 and 1-2), the summons issued to Northrop Grumman (doc. no. 3), and defendant's motion for an extension of time within which to respond to the complaint (doc. no. 5). *See* doc. no. 12 (Order to Seal). All subsequent pleadings have referred to the plaintiff through use of the masculine pseudonym "John Doe."

[2] *See* doc. no. 7 (Amended Complaint), at 6.

his claim of "Discrimination Under the Americans with Disabilities Act" (Count III).[3] Upon consideration of that motion, the Amended Complaint, and the parties' briefs, the court concludes the motion should be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). That rule must be read together with Rule 8(a), which requires a pleading to contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While that standard does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). As the Supreme Court stated in its *Iqbal* opinion:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*, 550 U.S., at 555]. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id*., at 557.
>
> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id*., at 570. A claim has facial plausibility when the plaintiff pleads

---

[3] *See* doc. no. 13 (Defendant's Motion for Partial Dismissal).

2

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*., at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*., at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*., at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id*., at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis supplied, second and fourth alterations in original, other alterations supplied).

## II. FACTS

The pivotal assertion in plaintiff's complaint is that, "[i]n or around 2014, [he] was diagnosed with *gender dysphoria*"[4] — a condition marked by displeasure or unhappiness with the gender assigned to a person at birth.[5] That diagnosis led plaintiff to begin a "gender transition" by "undergoing hormone replacement therapy" during March of 2016, while still on active duty with the United States Army.[6] Even though plaintiff did not deploy outside the continental United States after beginning his gender transition therapy, the Charge he filed with the Equal Employment Opportunity

---

[4] Doc. no. 7 (Amended Complaint), ¶ 11 (alterations and emphasis supplied).

[5] For example, the definitive diagnostic manual of mental disorders promulgated by the American Psychiatric Association states that:

> Individuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as *natal gender*) and their experienced/expressed gender. This discrepancy is the core component of the diagnosis. There must also be evidence of distress about this incongruence. Experienced gender may include alternative gender identities beyond binary stereotypes. Consequently, the distress is not limited to a desire to simply be of the other gender, but may include a desire to be of an alternative gender, provided that it differs from the individual's assigned gender."

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition*, at 453 (2013) (italicized emphasis in original). *See also, e.g.*, Raymond J. Corsini, *The Dictionary of Psychology*, at 406 (2002) (defining "Gender dysphoria" as "Displeasure or unhappiness associated with a person's assigned gender role, and with reactions of others who have certain expectations about gender-appropriate behavior.").

[6] Doc. no. 7 (Amended Complaint), ¶ 12.

4

Commission on November 9, 2018, stated that the Army assured him that his

> transition would not be an obstacle to my deployment.
>
> I was a high-performing and well-respected member of my unit, and my performance impressed a field engineer who worked at Northrop Grumman Corporation (henceforth "NGC"). This engineer provided me with a recommendation and I was subsequently hired by NGC on November 28, 2017 as a level 2 field engineer for Air Defense Airspace Management Systems and Air and Missile Defense Planning and Control Systems.
>
> One of the reasons I wanted to work at NGC was their diversity policy which states, in part, "*Northrup* [sic] *Grumman is committed to hiring and retaining a diverse workforce. We are proud to be an Equal Opportunity / Affirmative Action Employer, making decisions without regard to race, color, religion, creed, sex, sexual orientation, gender identity, marital status, national origin, age, veteran status, disability or any other protected class.*"

Doc. no. 7-1 (Plaintiff's EEOC Charge), at 3 (italics in original).[7]

Plaintiff began working as a Field Engineer in the Air Defense Airspace Management Systems Division at Northrop Grumman's Voyager Way facility in Huntsville, Alabama, on January 8, 2018.[8] During his second week there, plaintiff became aware that some co-employees were beginning to notice changes in his appearance and demeanor as a result of his hormone replacement therapy.[9] As a result, plaintiff spoke to his division manager, Tim Cannon, as well as with an unspecified

---

[7] *See also id.*, ¶¶ 12-16 (similar allegations).

[8] *See id.*, ¶ 15, and doc. no. 7-1 (EEOC Charge), at 3.

[9] *See* doc no. 7 (Amended Complaint), ¶ 17, and doc. no. 7-1 (EEOC Charge), at 3.

person or persons in Northrop Grumman's Human Resources Department. Cannon "assured Plaintiff that he would work with him to ensure that his transition would not pose any impediment to his job duties," and the unidentified Human Resources employee(s) "went to great lengths in order to assuage his concerns and assure him that neither his transitional state, his sexuality, nor his characteristics would be considered in employment decisions." Doc. no. 7 (Amended Complaint), ¶¶ 18 and 19.[10]

About three months later, however, Brian Walker replaced Tim Cannon as manager of plaintiff's division.[11]

> 22. Plaintiff shared his prior conversations with Mr. Cannon and the HR Department with Walker.
>
> 23. However, Walker took a much more intransigent approach than did his predecessor regarding Plaintiff's transition, his sexuality, and his developing female characteristics.
>
> 24. Walker told Plaintiff that, even if he met all the medical requirements and military requirements necessary to be deployed, he would still not allow Plaintiff to deploy in a foreign position, as he remained concerned that something might happen to Plaintiff because of his rapidly-developing female characteristics, his sexual preference (although they had not discussed same) and/or his transitioning.

---

[10] *Compare* quoted text *with* doc. no. 7-1 (EEOC Charge), at 3 (where, in speaking of his conversation with division manager Tim Cannon about his gender transition, plaintiff states that Cannon "promised to work with me to ensure that there would be no impediment to my job duties, *including my ability to potentially deploy*") (emphasis supplied).

[11] *See* doc. no. 7 (Amended Complaint), ¶ 21 ("In or around March 2018, Brian Walker became Plaintiff's new manager."); doc. no. 7-1 (EEOC Charge), at 3 (same).

25. Walker's "solution" was to deny Plaintiff's request for the opportunity to deploy to a foreign position.

26. Walker then sought Plaintiff's transfer to a different department.

27. Walker undertook efforts to hinder Plaintiff's ability to deploy, derail his career and seek his transfer because of Plaintiff's female sexual characteristics and/or his transitional state.

28. Once Walker made the decision to essentially end his [plaintiff's] engineering career, Plaintiff contacted the HR Department to complain about Walker's discriminatory actions.

29. A few weeks later, the HR Department informed Plaintiff that he would be laid off in two weeks as deployment was a requirement of the job he was performing.

30. The emotional distress of learning this led Plaintiff to attempt suicide, unsuccessfully, the same evening and he was hospitalized for a week as a result.

31. Plaintiff was discriminated against and terminated in violation of Title VII of the Civil Rights Act (1964), as amended, and the Americans with Disabilities Act based on certain female characteristics he had developed as a result of taking HRT [*i.e.*, Hormone Replacement Therapy] and/or his diagnosis of gender dysphoria.

*Id.*, at 4-6 (alteration supplied).

Plaintiff filed a charge of discrimination with the EEOC on November 9, 2018,[12] and was notified of his right to commence suit within ninety days on April 3rd of the following year.[13] He filed this action eighty-three days later, on June 25, 2019.[14]

---

[12] Doc. no. 7-1 at 2-3.

[13] Specifically, the EEOC notified the plaintiff that: "Based upon its investigation, the EEOC

## III. DISCUSSION

Plaintiff's amended complaint contains three counts. The first, titled "Sexual Discrimination under Title VII," mixes terminology normally associated with a hostile work environment claim into allegations of gender discrimination: *i.e.*,

> 34. Plaintiff has been discriminated against by Defendant, NGSC [Northrop Grumman Systems Corporation], because of the perceived stereotypes regarding the female gender and subjected to *both a subjectively and objectively hostile work environment, and to* less-favorable working conditions including remuneration as a result.
>
> 35. The above-discussed sex discrimination violated Title VII of the Civil Rights Act (1964), as amended.

Doc. no. 7 (Amended Complaint), at 5-6 (alteration and emphasis supplied).

Defendant's Motion for Partial Dismissal argues that plaintiff's amended complaint contains absolutely no factual allegations that conceivably could support a hostile work environment claim based upon plaintiff's gender transition therapy.[15]

---

is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." Doc. no. 7-2 at 2.

[14] Doc. no. 1 (Complaint).

[15] A plaintiff desiring to establish a Title VII hostile work environment sexual harassment claim normally must show that: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based upon the plaintiff's sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding the employer responsible under a theory of either vicarious or direct liability. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*). *See also*, *e.g.*, *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003); *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 508 (11th Cir. 2000); *Gupta v. Florida Board of Regents*, 212 F.3d 571, 582 (11th Cir. 2000); *Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Bell v. Crackin Good Bakers, Inc.*,

Plaintiff concedes that aspect of defendant's motion: *i.e.*, "The Plaintiff agrees that he has not alleged a 'hostile environment' claim under Title VII and agrees that allegation should be partially dismissed and has not included a response to that portion of the Motion." Doc. no. 22 (Response to Defendant's Motion for Partial Dismissal), at 3 & n.1.

When the hostile work environment references are excised from the text of Count I, all that remains is the following: "Plaintiff has been discriminated against by Defendant . . . because of the perceived stereotypes regarding the female gender and subjected to . . . less-favorable working conditions including remuneration as a result." Doc. no. 7, ¶ 34, at 6 (ellipses supplied). While those bare-bone allegations push the *Twombly-Iqbal* pleading standards to the edge of acceptability, the court will allow the claim to stand until completion of discovery.

The remainder of defendant's Motion for Partial Dismissal focuses upon Count III of the amended complaint, which alleges a violation of the Americans with Disability Act ("ADA"), which was enacted by Congress in 1990 for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).[16]

---

777 F.2d 1497, 1502-03 (11th Cir. 1985); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982).

[16] When considering the need for such legislation, Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination . . . continue to be a serious and pervasive social problem." 42 U.S.C.

9

To achieve such purposes, among others, the Act provides that no covered entity,[17] including private employers,[18]

> shall discriminate against *a qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (emphasis supplied). The emphasized phrase, "a qualified individual with a disability," is defined as meaning "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8). In

---

§ 12101(a)(2). Discrimination was found to persist in "critical areas" of everyday life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id*. § 12101(a)(3). Congress further found that discrimination against persons with disabilities took many forms, ranging from "outright intentional exclusion," to "failure to make modifications to existing facilities and practices." *Id*. § 12101(a)(5). Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled persons, and to integrate them "into the economic and social mainstream of American life." S. Rep. No. 101-116, at 20 (1989); H.R. Rep. No. 101-485, pt. 2, at 50 (1990); U.S .Code Cong. & Admin. News 1990, pt. 2, at 303, 332.

The Act as codified (42 U.S.C. § 12101 *et seq*.) is divided into three principal Subchapters, referred to as "Titles" in the original legislation. Title I (*id*. §§ 12111 – 12117) addresses discrimination in employment settings. Title II (*id*. §§ 12131 – 12165) covers discrimination in the provision of public services by governmental entities. Title III (*id*. §§ 12181 – 12189) deals with public accommodations and services provided by private entities. Title IV (*id*. §§ 12201 – 12213) addresses so-called "miscellaneous provisions."

[17] 42 U.S.C. § 12111(2) provides: "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee."

[18] 42 U.S.C. § 12111(5)(A) provides, in relevant part, that: "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person. . . ."

turn, the concept of "disability" is defined in three ways — that is, as including any person who has a "physical or mental impairment" that "substantially limits" one or more of the "major life activities" of such person, or who has "a record of such an impairment," or who is "regarded as having such an impairment." *Id.* § 12102(2)(A)–(C); *see also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

The Act imposes upon employers the duty to provide "reasonable accommodations" for individuals with known disabilities, unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A).[19]

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he can perform the essential functions of the employment position he holds or seeks, with or without reasonable accommodation being made by the employer;[20] and (3) that he suffered an

---

[19] 42 U.S.C. § 12112(b)(5)(A) defines the term "discriminate" as including an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant [for employment] or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; . . . ."

[20] *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the

11

adverse employment action because of his disability.[21] *See, e.g., Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11th Cir. 2019).[22]

Defendant's motion for dismissal of plaintiff's ADA claim focuses upon the first of those prima facie elements, and contends that plaintiff's claim fails as a matter of law because the statutory definition of the term "disability" unambiguously states that "gender identity disorders" are not covered. *See* doc. no. 13 (Motion for Partial Dismissal), at 4. The relevant statutory provision states that:

Under this chapter, the term "disability" shall not include —

(1) transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders* not resulting from physical impairments, or other sexual behavior disorders;

(2) compulsive gambling, kleptomania, or pyromania; or

---

essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

[21] There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (per curiam)).

[22] *See also, e.g., Mazzeo v. Color Resolutions International, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014); *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).

>    (3) psychoactive substance use disorders resulting from current illegal use of drugs.

42 U.S.C. § 12211(b) (emphasis supplied).

Plaintiff's initial response to defendant's motion observes that the condition alleged in his complaint is "gender dysphoria,"[23] and that "gender dysphoria" is not specifically excluded by the language of 42 U.S.C. § 12211(b).[24] That response overlooks the fact, however, that 42 U.S.C. § 12211(b) has not been amended since it was enacted on July 26, 1990. The statute utilizes the descriptive term referenced in defendant's motion, "gender identity disorders," but that term was replaced in 2013 by the Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders with the one employed by plaintiff: "gender dysphoria."

> *Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and / or surgery are not available. <u>The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.</u>

---

[23] *See* doc. no. 7 (Amended Complaint), ¶ 11 ("In or around 2014, Plaintiff was diagnosed with gender dysphoria.").

[24] *See* doc. 22 (Plaintiff's Response to Motion for Partial Dismissal), at 4-5 ("Gender dysphoria, as pled in the Plaintiff's Complaint, is a medical impairment that the Plaintiff has been diagnosed with by a physician. Per the statute itself, 'gender dysphoria' is not an excluded medical condition.").

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition*, at 451 (2013) (*italicized emphasis* in original, <u>underscored emphasis</u> supplied). Accordingly, the terms "gender identity disorder" and "gender dysphoria" are legally synonymous for purposes of the present motion. *See*, *e.g.*, *Parker v. Strawser Construction, Inc.*, 307 F. Supp. 3d 744, 754-55 (S.D. Ohio 2018); *Gulley-Fernandez v. Wisconsin Department of Corrections*, No. 15-CV-995, 2015 WL 7777997, at *2-*3 (E.D. Wis. Dec. 1, 2015). *Cf. Michaels v. Akal Security, Inc.*, No. 09-cv-01300-ZLW-CBS, 2010 WL 2573988, at *6 (D. Col. June 24, 2010) ("Gender dysphoria, as a gender identity disorder, is specifically exempted as a disability by the Rehabilitation Act [of 1973, 29 U.S.C. § 701 *et seq*.]," which contains exclusionary language that is identical to the ADA).

The second part of plaintiff's response to defendant's motion asserts that defendant has not disputed that his "gender dysphoria" results from a physical impairment: *i.e.*,

> The ADA does expressly provide that "(1) transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders *not resulting from physical impairments*, or other sexual behavior disorders" as [*sic*: ? "are" ?] conditions which are outside the scope of the statute's definition of "disability." 42 U.S.C. § 12211(b)(1) (emphasis added). However, there is no mention of gender dysphoria, <u>and the Defendant has nothing to dispute the Plaintiff's clear allegations that his condition</u> is a medical one that <u>does result from a physical impairment</u>.

Doc. 22 (Plaintiff's Response to Motion for Partial Dismissal), at 5 (*italicized*

14

*emphasis* in original, <u>underscored emphasis</u> supplied).

However, one will search plaintiff's amended complaint and underlying EEOC Charge in vain for *any allegation*, much less "clear allegations," that plaintiff's gender dysphoria results "from a physical impairment." There simply is no such assertion, and that is fatal to plaintiff's ADA claim. *See*, *e.g.*, *Parker v. Strawser Construction*, 307 F. Supp. 3d at 754-55 (holding that the plaintiff's failure to allege that her gender dysphoria was caused by a physical impairment, or that gender dysphoria always results from a physical impairment, barred her ADA claim).

The cases relied upon by plaintiff are not binding upon this court, and they are not persuasive. *Doe v. Massachusetts Department of Correction*, No. CV 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018); *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123 (E.D. Pa. May 18, 2017).

The final part of plaintiff's response to defendant's motion to dismiss his ADA claim is that such a ruling would "violate[] his right to equal protection under the U.S. Constitution." Doc. no. 22 (Response to Defendant's Motion for Partial Dismissal), at 6. As defendant aptly observes, however, that conclusory assertion does not meet plaintiff's burden:

> In assessing whether a classification made in the law violates the Equal Protection Clause, "the *burden is on the challenger* to disprove every conceivable basis which might support the classification, 'whether or not the basis has a foundation in the record.'" *Panama City Medical*

*Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1547 (11th Cir. 1994) (emphasis added).

Doc. no. 25 ((Reply in Support of Defendant's Motion for Partial Dismissal), at 7.

Accordingly, this court concludes that a condition of "gender dysphoria" (formerly described as a "gender identity disorder") that does not result from a physical impairment is expressly excluded from the definition of disabilities covered by the Americans with Disabilities Act. 42 U.S.C. § 12211(b)(1).

A separate Order consistent with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 22nd day of October, 2019.

_____
United States District Judge